# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HOSPITALITY INVESTORS TRUST, INC.,

Plaintiff,

- against -

ALLIED WORLD ASSURANCE
COMPANY (U.S.), INC; ARCH
SPECIALTY INSURANCE COMPANY;
ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY; INTERSTATE
FIRE & CASUALTY COMPANY; STARR
SURPLUS LINES INSURANCE
COMPANY; WESTPORT INSURANCE
CORPORATION; and ZURICH AMERICAN
INSURANCE COMPANY,

Defendants.

**Index No.** _____

**SUMMONS**

 **YOU ARE SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint. This is an insurance coverage action for declaratory judgment pursuant to CPLR § 3001, breach of contract, breach of the covenant of good faith and fair dealing, and violation of Section 349 of the New York Deceptive Practices Act.

**DATED**:   June 21, 2022
     New York, New York

HUNTON ANDREWS KURTH LLP

/s/ *Michael S. Levine*
Michael S. Levine
200 Park Avenue
New York, NY 10166
mlevine@huntonak.com
212-309-1170

*Attorneys for Plaintiff,*
*Hospitality Investors Trust, Inc.*

Case 1:22-cv-08781   Document 1-1   Filed 10/14/22   Page 3 of 38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————

HOSPITALITY INVESTORS TRUST, INC.,

                      Plaintiff,

            - against -

ALLIED WORLD ASSURANCE
COMPANY (U.S.), INC., ARCH
SPECIALTY INSURANCE COMPANY,
ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY, INTERSTATE
FIRE & CASUALTY COMPANY, STARR
SURPLUS LINES INSURANCE
COMPANY, WESTPORT INSURANCE
CORPORATION, and ZURICH AMERICAN
INSURANCE COMPANY,

                      Defendants.

————————————————————————

**Index No.** _____

**COMPLAINT**

      Hospitality Investors Trust, Inc. ("Plaintiff" or "HIT"), by and through its undersigned attorneys, make this Complaint for Declaratory Relief, Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and violation of the New York Deceptive Practices Act, New York General Business Law Section 349, against insurance companies Allied World Assurance Company (U.S.), Inc., Arch Specialty Insurance Company, Endurance American Specialty Insurance Company, Interstate Fire & Casualty Company, Starr Surplus Lines Insurance Company, Westport Insurance Corporation, and Zurich American Insurance Company (collectively, the "Defendants" or "Insurers") in this Court under the provisions in the relevant insurance policies they sold to HIT and states as follows:

Case 1:22-cv-08781   Document 1-1   Filed 10/14/22   Page 4 of 38

## I.    INTRODUCTION.

1.    HIT is a real estate investment trust (REIT) whose portfolio includes hotel properties across the country, including the hotel properties at issue in this insurance recovery action (collectively, the "Hotel Properties").

2.    The Hotel Properties include select-service hotels that are generally intended to be convenient for travelers.  HIT owned or leased 104 hotels across the country as of March 31, 2020, with thousands of rooms or suites.

3.    At the Hotel Properties, many staff members provide services to guests and customers, including housekeeping and other hospitality-related services.  The Hotel Properties are generally open and provide services to guests all day, every day.

4.    The Insurers sold HIT insurance policies to cover the Hotel Properties under a broad "all-risk" commercial property insurance program with up to $150,000,000 in limits (the "Program").[1]

5.    The Program has an effective period of January 1, 2020, to January 1, 2021.

6.    The Program provides maximum coverage for business interruption losses caused by "all risks" of "direct physical loss or damage" to the Hotel Properties.

7.    The Hotel Properties sustained direct physical loss and damage, beginning in March 2020 and continuing to present, by a peril insured by the Program.

8.    The peril insured—the presence of a communicable disease and its causative virus —implicates coverage in two independent ways:

>    a.    First, where the presence of a communicable disease and its causative virus cause physical loss or damage to insured property, that loss or damage

---

[1] Unless otherwise indicated, terms initial- or all-capitalized, in boldface, or set off by quotation marks are taken from the policies in the Program.

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 5 of 38

implicates the Program's property damage and associated time element coverages.

b. Second, even where a communicable disease is present, but has not caused physical loss or damage, the presence of that disease implicates the Program's additional non-physical loss or damage that communicable disease coverage grants. These grants are distinct and apart from the other grants in the Program requiring physical loss or damage.

9. Other than as may be required under the Program's communicable disease coverage, HIT's insurance claim is not about loss or damage caused by any government or health authority order(s).

10. Symptomatic, pre-symptomatic, and asymptomatic guests and staff members infected with COVID-19 (a highly contagious and potentially deadly communicable disease) were onsite at each of the Hotel Properties on a frequent, regular, and consistent basis over the course of the pandemic.

11. Since March 2020, dozens of guests and staff members at the Hotel Properties have been diagnosed with COVID-19, many of whom were onsite before, during, and in the immediate aftermath of their diagnosis.

12. While onsite, the infected individuals shed SARS-CoV-2 (the causative agent of COVID-19) through normal breathing, talking, and other ways, into the indoor air and onto surfaces throughout the Hotel Properties. Both COVID-19 and SARS-CoV-2 are physical substances. Their introduction into the indoor air and onto surfaces at the Hotel Properties cause a physical alteration of the air and surfaces by changing the composition of the air and altering the character of the surfaces from a previously safe condition to a dangerous and potentially deadly

condition.   The physical alteration of the content of the air by introduction of these highly infectious physical substances is damage.

13.     Once shed, the infectious particles remain in and travel through the air.   The infectious particles cannot be cleaned from the air.

14.     Also, once shed, the infectious particles settle on surfaces, adhering to those surfaces through gravitation and electrostatic forces.   This physical alteration of the surfaces also is damage.   Unlike dust, which is visible and, thus, identifiable, infectious SARS-CoV-2 particles cannot be effectively cleaned from all surfaces in a commercial setting like the Hotel Properties. And, even if it could be effectively cleaned (it cannot), continued operation of the property results in reintroduction of infectious particles, requiring that the remediation and repair process occur continually.

15.     Furthermore, because SARS-CoV-2 particles cannot be cleaned and because of the continued use of insured property, as required for purposes of mitigating the insured business interruption loss, infectious SARS-CoV-2 particles are continually reintroduced.   SARS-CoV-2 is not evanescent.

16.     This introduction and reintroduction of infectious SARS-CoV-2 particles caused direct physical loss and damage to Property Insured (as defined below) in several ways:

a. Individuals infected with COVID-19 shedding SARS-CoV-2 directly, physically and tangibly change, alter and transform the content of the indoor air and the composition of the surfaces throughout the buildings and structures at the Hotel Properties—such that now these contain a concentration of SARS-CoV-2 infectious particles (whereas before they did not).   This tangible change and alteration, caused by the physical presence of SARS-CoV-2, is damage.

5

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 7 of 38

    b. The physically changed and altered air and surfaces caused by the presence and intrusion of COVID-19 and SARS-CoV-2 onto the Hotel Properties rendered the properties unfit for their fully insured use—hospitality properties for guests—and deprived HIT of the full insured use of these properties. This loss of fitness and utility, caused by the intrusion of a dangerous and potentially lethal physical substance, is direct physical loss. This is precisely the impact that ammonia, airborne asbestos fibers, toxic fumes (including carbon monoxide), pervasive odors and/or wildfire smoke have on property—all of which have been found by courts to cause direct physical loss or damage to property.

17.    The direct physical loss and damage caused by COVID-19 and SARS-CoV-2 required repair and remediation in order for HIT to continue business operations at the Hotel Properties. In that way, HIT's claim is based on more than a mere loss of use.

18.    For example, HIT was required to employ specialized cleaning and disinfection of its property; just the same as would occur with a flood or sewage overflow, which is covered under the Program. Similar, HIT was required to erect physical barriers (*e.g.*, plexiglass dividers at reception counters) at the Hotel Properties; just the same as if barriers were erected to prevent infiltration of flood waters encroaching upon those locations, something that also is covered under the Program. HIT was also required to close portions of the Hotel Properties and suspend aspects of its operations; just the same as would occur following a fire in a portion of an insured property, something that also is undeniably covered under the Program.

19.    The physicality of the damage—the tangible alteration of HIT's property—can, and will be, demonstrated by experts.

6

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 8 of 38

20. From the outset of the pandemic, COVID-19 has had a substantial effect on the hotel industry. The industry has been severely crippled, and occupancy at the Hotel Properties significantly decreased. Although the Hotel Properties operated at reduced levels (and some closed for guest occupancy) through the COVID-19 pandemic, they were at high risk for COVID-19 and SARS-CoV-2 spreading among the facilities, guests, and staff.

21. Since March 2020, the Hotel Properties have taken extraordinary measures to address COVID-19 and SARS-CoV-2 on-site and their associated physical impact by, among other things, closing certain operations and services, substantially modifying others, restricting access to and within many of the Hotel Properties, enforcing physical distancing, and undertaking efforts to continue business operations as nearly normal as practicable while working to repair and restore the facilities to their pre-COVID-19 and pre-SARS-CoV-2 physical operating condition (a process which is still ongoing).

22. But due to the presence of guests and staff members at the Hotel Properties daily and the prevalence of infection among the guests and staff members at the Hotel Properties, COVID-19 and SARS-CoV-2 have been consistently present at, and are constantly being reintroduced to, the Hotel Properties. Even applying a modest community prevalence rate, there have been hundreds (if not thousands) of infected individuals on-site at the Hotel Properties since the outset of the pandemic.

23. As a result, COVID-19 and infectious SARS-CoV-2 particles have been pervasive and omnipresent at the Hotel Properties over the course of this pandemic, and their complete elimination from the real and personal property at the Hotel Properties, including indoor air and surfaces, has been impossible.

7

Case 1:22-cv-08781  Document 1-1  Filed 10/14/22  Page 9 of 38

24.     The actual presence of COVID-19 and SARS-CoV-2 on-site at each of the Hotel Properties caused physical loss and damage, and has further caused HIT to experience significant business interruption losses and to incur extra expenses (among other damages).

25.     As explained in more detail below, certain policies in the Program also cover risks for communicable disease, even when there is no "physical loss or damage" under their Communicable Disease Response and Interruption by Communicable Disease provisions.

26.     The foregoing provisions are triggered under the current facts and circumstances, yet the Insurers predetermined that they would not cover HIT's COVID-19 claim (the "Claim"). Consequently, the Insurers failed to conduct a meaningful investigation of the Claim, concertedly refused to acknowledge that the presence of COVID-19 at the Hotel Properties satisfied the policies in the Program, misled HIT about the coverage afforded, forced HIT to engage in time-consuming and onerous information-gathering expeditions and drafting of communications to substantiate the Claim, failed to act reasonably upon HIT's communications about the Claim, and denied coverage for the Claim all without reasonable justification.

27.     The Insurers' "investigation" into the Claim was a sham from the start.  In response to HIT's March 25, 2020 notice, the Insurers' designated adjuster, Sedgwick, sent HIT a boilerplate reservation of rights letter on May 12, 2020, accompanied by two pages of complex, compound questions, several of which Sedgwick knew were impossible to answer and, thus, were solely designed to lead to one result: denial of the Claim.

28.     Tellingly, Sedgwick never visited any of the Hotel Properties in relation to the Claim or to inspect the loss or damage.

29.     By letter dated August 31, 2020, HIT confirmed it had experienced "physical loss or damage" to insured property caused by COVID-19 and SARS-CoV-2 on-site at the Hotel

Properties. HIT also preemptively explained to the Insurers why the exclusions in the Program did not apply to the Claim.

30. The Insurers failed to respond for months, despite repeated prodding by HIT. Finally, on November 20, 2020, the Insurers responded, refusing to confirm or deny coverage and requesting even more information.

31. By additional letter dated August 20, 2021, HIT provided the Insurers with extensive information about the presence of guests and staff members infected with COVID-19 at the Hotel Properties and HIT's associated business interruption losses and extra expenses. This information showed, in relevant part, that a minimum of 42 insured Hotel Locations had individuals with COVID-19 positive test diagnoses during 2020, and the COVID-19 positive test diagnoses at these insured locations totaled at least 59 for the relevant period (which is a conservative number based on reported diagnosis only given the community prevalence rates).

32. For months, the Insurers deceived HIT into thinking that they were actively investigating the Claim and would give due weight to the information HIT provided. The Insurers' conduct was all for show. Ultimately, the Insurers effectively denied coverage and refused to pay any part of HIT's Claim under any coverage provision, including the coverage provisions that undeniably apply to communicable disease losses.

33. The Insurers' conduct summarized here constitutes breach of contract, breach of the covenant of good faith and fair dealing, bad faith and improper claims handling, and deceptive practices.

## II. JURISDICTION AND VENUE.

34. A declaratory judgment action may be properly sought in this Court pursuant to CPLR § 3001 and under Judiciary Law 140-b.

35.     Personal jurisdiction over the Insurers is proper pursuant to CPLR § 301. Under the policies at issue, the Insurers contracted to resolve any disagreement arising out of the policies within any court of competent jurisdiction in the State of New York.

36.     Alternatively, or in addition to the policies' jurisdiction provisions, this Court has jurisdiction over the Insurers pursuant to CPLR §§ 301 or 302 because, upon information and belief, the Insurers: (i) carry on a continuous and systematic part of their general business within the State of New York, including, but not limited to, marketing, selling, and issuing insurance policies to State of New York businesses; (ii) are authorized insurers in the State of New York; or (iii) generally transact business throughout the State of New York.

37.     Venue is proper in this Court pursuant to CPLR § 501 under the policies' jurisdiction provisions. Alternatively, or in addition to the policies' jurisdiction provisions, venue is proper in this Court under CPLR § 503 because HIT's principal place of business during the relevant time was in New York, New York, and HIT has an office and transacts and conducts business in New York, New York.

## III.     THE PARTIES.

38.     HIT is a real estate investment trust that, among other things, acquires, leases and invests in hotel properties across the United States. HIT was formed under Maryland law, and is authorized and transacts business in the State of New York. For the relevant period, HIT had a principal place of business at 65 East 55th Street, Suite 801, New York, New York 10022. HIT still has an office at the same address and conducts business in New York, New York.

39.     Upon information and belief, Defendant Allied World Assurance Company (U.S.), Inc. ("AWAC") is a corporation incorporated under the laws of Delaware, with its principal place of business in Massachusetts. AWAC is, among other things, in the business of issuing insurance

Case 1:22-cv-08781  Document 1-1  Filed 10/14/22  Page 12 of 38

policies to companies such as HIT. Upon information and belief, AWAC is authorized and conducts business within New York.

40.     Upon information and belief, Defendant Arch Specialty Insurance Company, ("Arch") is a corporation incorporated under the laws of Missouri, with its principal place of business in New Jersey. Arch is, among other things, in the business of issuing insurance policies to companies such as HIT. Upon information and belief, Arch is authorized and conducts business within New York.

41.     Upon information and belief, Defendant Endurance American Specialty Insurance Company ("Endurance"), is a corporation incorporated under the laws of Delaware, with its principal place of business in New York. Endurance is, among other things, in the business of issuing insurance policies to companies such as HIT. Upon information and belief, Endurance is authorized and conducts business within New York.

42.     Upon information and belief, Defendant Interstate Fire & Casualty Company ("Interstate") is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois. Interstate is, among other things, in the business of issuing insurance policies to companies such as HIT. Upon information and belief, Interstate is authorized and conducts business within New York.

43.     Upon information and belief, Defendant Starr Surplus Lines Insurance Company ("Starr") is a corporation incorporated under the laws of New York, with its principal place of business in Texas. Starr is, among other things, in the business of issuing insurance policies to companies such as HIT. Upon information and belief, Starr is authorized and conducts business within New York.

Case 1.22-cv-08781 Document 1-1 Filed 10/14/22 Page 13 of 38

44.     Upon information and belief, Westport Insurance Corporation ("Westport") is a corporation incorporated under the laws of Missouri, with its principal place of business in Missouri.  Westport is, among other things, in the business of issuing insurance policies to companies such as HIT.  Upon information and belief, Westport is authorized and conducts business within New York.

45.     Upon information and belief, Zurich American Insurance Company ("Zurich") is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois. Zurich is, among other things, in the business of issuing insurance policies to companies such as HIT.  Upon information and belief, Westport is authorized and conducts business within New York.

## IV.    HIT'S "ALL RISKS" INSURANCE PROGRAM.

46.     HIT's property assets are insured under a multi-layer, multi-carrier insurance program (the "Program" as referred to here) maintained by Crestline Hotel & Resorts, LLC.

47.     The Program provides "all risks" property insurance coverage under a lead primary layer policy sold by Endurance ("Primary Endurance Policy"), No. GPR10010408103, and a lead excess layer policy sold by Westport ("Excess Westport Policy"), No. NAP 2000266 05.  The Program's other insurers afford coverage under terms like those of their respective layer's lead carrier, with certain exceptions.  In addition to the Primary Endurance Policy and Excess Westport Policy, the other policies in the Program are:

| Carrier / Policy | Policy No. |
| --- | --- |
| Starr Surplus Lines Insurance Co. ("Primary Starr Policy," at primary level; and "Excess Starr Policy," at excess level) | SLSTPTY11252120 |
| Allied World Assurance Co. ("Primary AWAC Policy") | 0311-6661-1A |
| Zurich American Insurance Co. ("Primary Zurich Policy") | ERP3898176-00 |

12

| Carrier / Policy | Policy No. |
|---|---|
| Interstate Fire & Casualty Co. ("Primary IFC Policy") | RTX20008420 |
| Arch Specialty Insurance Co. ("Excess Arch Policy") | PRP1000052-00 |
| Interstate Fire & Casualty Company ("Excess IFC Policy") | RTX20008420 |

## V.   COVERAGE UNDER THE PROGRAM.

48.     The Insurers sold HIT the policies in the Program for the period from January 1,

2020, to January 1, 2021, in exchange for HIT's payment of significant insurance premiums.

49.     HIT is a First Named Insured on the policies in the Program.

50.     The Program contains a single Program Policy Limit of $150,000,000 in coverage

against "all risks" from "physical loss or damage."

51.     In this grant of coverage, the term "loss" is separate and distinct from, and has an

independent meaning than, the phrases "damage."  The Program does not define the individual

terms "loss" or "damage" or the entire phrase "physical loss or damage."

52.     Nor does the Program require a "structural" alteration to trigger coverage.  Yet,

negative physical alterations (including physical alterations to buildings and structures) as

described herein have occurred at the Hotel Properties.

53.     Nor does the Program require a "permanent" impact to trigger coverage.  Rather,

the physical impacts described here at the Hotel Properties are ongoing and persistent, require

repairs and restoration efforts and cannot be remedied by cleaning and disinfecting as described

below.  The Program also contains Program Sub-limits of Liability.

54.     The participating insurers agreed to afford coverage up to the various limits and

sub-limits according to their agreed Program participation percentages.

13

Case 1:22-cv-08781  Document 1-1  Filed 10/14/22  Page 15 of 38

55.     In the event the loss for a sub-limited coverage exceeds the quota-share or percentage participation of coverage provided by the primary layer policies in the Program, the excess policies that also provide for such coverage are obligated to "drop down" or otherwise provide coverage up to the applicable sub-limit.  Otherwise, the applicable sub-limit as outlined in the Program and policies would be illusory, and contrary to law and settled principles of policy interpretation.

56.     The "Property Insured" under the Program's policies includes the Hotel Properties. HIT's real and personal property, including the Hotel Properties, their respective buildings, structures, yard areas, and the contents at those locations (including the indoor air and surfaces, such as fixtures, equipment, furniture, etc.) are "Property Insured."

57.     The policies in the Program list certain categories of real or personal property that are excluded.  The excluded property list does not include either indoor air or surfaces.

**A.      The Program Covers Business Interruption, Extra Expenses, Communicable Disease, and Other Losses and Expenses.**

**a.      The Program's Time Element Coverage.**

58.     All policies in the Program provide "Time Element" coverage up to $150,000,000 for HIT's Gross Earnings where HIT's business interruption results from "direct physical loss or damage . . . of the type insured" by the Program.

59.     The main coverage grant for Time Element losses provides coverage, *inter alia*, for Gross Earnings Loss.  This coverage is triggered to the extent that the Insured is, among other things, wholly or partially prevented from continuing business operations or services.  Under the Program, the recoverable Gross Earnings loss is the Actual Loss Sustained by the Insured during the Period of Liability.  The Program defines Gross Earnings as "the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 16 of 38

Insured." The period of liability for this coverage begins at the time of physical loss or damage and ends when the insured location is made ready for operations under the same or equivalent physical and operating conditions that existed before the damage. It is then extended for such additional length of time "as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred."

### b.    The Program's Communicable Disease Coverage.

60.    The Program provides coverage for "Communicable Disease Response" and "Interruption by Communicable Disease" (collectively, "Communicable Disease Coverage") up to $4,000,000. This coverage is afforded at the primary layer under the Primary AWAC Policy and Primary Zurich Policy; and at the excess layer under the Excess Westport Policy, Excess Arch Policy, and IFC Excess Policy.

61.    "Communicable Disease Response" coverage is triggered if a location owned, leased, managed or rented by the Insured has the actual, not suspected, presence of communicable disease and access to such location is limited, restricted or prohibited by: (i) an order of an authorized governmental agency regulating the actual, not suspected, presence of communicable disease; or (ii) a decision of an Officer of the Insured as a result of the actual, not suspected, presence of communicable disease.

62.    The "Interruption by Communicable Disease" has the same triggering language as the coverage for Communicable Disease Response. As a result, where an Insured Property has the actual, not suspected, presence of communicable disease, and access to such location is limited, restricted or prohibited by an order of an authorized government agency or officer of HIT, this coverage applies.

15

63.     The Interruption by Communicable Disease coverage under the Primary Zurich

Policy differs from the communicable disease coverage discussed above.  The Primary Zurich

Policy will cover:

> The actual Gross Earnings loss sustained by the Insured . . . resulting from
> the necessary Suspension of the Insured's business activities at an Insured
> Location if the Suspension is caused by order of an authorized governmental
> agency enforcing any law or ordinance regulating communicable diseases
> and that such portions of the location are declared uninhabitable due to the
> threat of the spread of communicable disease, prohibiting access to those
> portions of the Location.

### c.     The Program's Other Relevant Coverages.

64.     The Program also affords various other relevant coverages (with different sub-

limits) that may apply either in addition to, or as an alternative to, the Time Element coverages

and Communicable Disease Coverage outlined above.

65.     All policies in the Program provides coverage for "Civil or Military Authority" up

to $100,000,000.  Under this coverage, the Program covers:

> [T]he Actual Loss Sustained and EXTRA EXPENSE incurred by the
> Insured during the PERIOD OF LIABILITY if an order or action of civil,
> military or other authority prohibits access to the Insured Location,
> provided such order or action is the direct result of physical damage of the
> type insured against under this Policy at the Insured Location or within five
> (5) statute miles of it.

66.     The Primary Endurance Policy and Primary IFC Policy contain an endorsement

titled, "Cancellation of Bookings Exclusion With Exception for Direct Physical Loss or Damage."

Under this endorsement, these policies provide coverage up to $150,000,000 for the "cessation or

diminution of trade due to a loss of potential customers at an Insured Location" if there is "direct

physical loss or damage to: (i) covered property by a covered cause of loss; or (ii) property of the

type insured under this policy by a covered cause of loss which directly affects the Insured's use

of the covered property."

16

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 18 of 38

67.     All policies in the Program provide "Extra Expense" coverage up to $15,000,000 per occurrence.  This coverage provision states:

> The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY: a) Extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and b) Extra costs of temporarily using property or facilities of the Insured or others, less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

68.     All policies in the Program provide "Ingress/Egress" coverage up to $100,000,000:

> [T]he Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to total prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy located within five (5) statute miles of the premises.

69.     The Primary AWAC Policy, Primary Starr Policy, Excess Westport Policy, Excess Arch Policy, Excess Starr Policy, and Excess IFC Policy, provide Attraction Property coverage:

> [T]he Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property and that attracts business to an Insured Location, and is within five (5) statute miles of the Insured Location.

> Under the Primary AWAC Policy, Primary Zurich Policy, Excess Westport Policy, Excess Arch Policy, and Excess IFC Policy, this coverage extension provides up to $5,000,000 of coverage per occurrence.  Under the Primary Starr Policy and Excess Starr Policy, this coverage only provides $1,000,000 of coverage and is limited to attractions within one statute mile from the insured location.

70.     All policies in the Program provide "Contingent Time Element Extended" coverage up to $25,000,000:

17

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 19 of 38

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at Contingent Time Element Locations located within the TERRITORY of this Policy.

**B.      COVID-19/SARS-CoV-2 Caused Physical Loss and Damage Covered by the Program.**

71.      Since the onset of the pandemic in March 2020, dozens of guests and staff members of the Hotel Properties were diagnosed with COVID-19.  Most of the guests and staff members with positive COVID-19 diagnoses were on-site near in time to their diagnosis.  As a result, COVID-19 (the communicable disease) and SARS-CoV-2 (its causative agent) have been continually present (and regularly reintroduced) at each of the Hotel Properties since March 2020 through the present.

72.      These COVID-19 positive individuals constantly shed infectious SARS-CoV-2 particles into the indoor air and onto surfaces throughout the Hotel Properties.  The indoor air and surfaces are real and personal property in which HIT has an insured interest under the Program and neither are excluded.

73.      Shedding SARS-CoV-2 into the indoor air and onto surfaces throughout the Hotel Properties physically and tangibly changes, alters, and transforms the content of the indoor air and the composition of the surfaces throughout the buildings and structures—and so now they contain concentrations of SARS-CoV-2 infectious particles (while before they did not).  This physical alteration of the content of the air and of the surfaces is direct physical damage to HIT's interests in real and personal property at the Hotel Properties as covered under the Program.

74.      The harmful intrusion of and resulting physical loss and damage caused by COVID-19 and SARS-CoV-2 at the Hotel Properties has rendered them unfit for their insured use—fully operational hotel and hospitality operations—and, thus, it has deprived HIT of the full operation

of its property for its insured purpose. This loss of fitness and utility caused by the intrusion of a dangerous and potentially lethal physical substance is direct physical loss of the insureds' interests in real and personal property at the Hotel Properties as covered under the policies.

75. This harmful intrusion of and resulting physical loss and damage caused by COVID-19 and SARS-CoV-2 at the Hotel Properties happened by chance, rather than by design; it was, thus, an unfortunate event and fortuitous for insurance-coverage purposes.

76. The physical changes to the content of the indoor air and the composition of the surfaces throughout the buildings and structures at each Hotel Property have been pervasive and omnipresent over time considering the number of infected individuals shedding SARS-CoV-2 particles on-site and the constant reintroduction of those particles.

77. Cleaning of surfaces is a way to repair the damage caused by COVID-19 and SARS-CoV-2 to surfaces; it is impossible to effectively clean air. Still, even cleaning of surfaces does not altogether eliminate the damage or end the physical loss. Some surfaces and objects retain residual infectious virus even after cleaning, and aerosolized infectious particles will attach to surfaces after cleaning.

78. The virus can cling to surfaces and remain in the air for long periods of time. It does not quickly fade or disappear. It is not evanescent.

79. Cleaning fails to guard against property continually being reinfected as soon as COVID-19 again enters the space. In short, cleaning is temporary at best—a surface and object remain infectious if an aerosol is present, HVAC system is operational, or if another infected person visits the space after cleaning. This intrusion will provide a constant modality for infection to people.

80. The Hotel Properties have been unable to eradicate COVID-19 and SARS-CoV-2 from the real and personal property at the Hotel Properties despite their efforts to eliminate both and to repair and restore the property to its pre-pandemic physical operating condition.

81. The Hotel Properties have taken extraordinary and robust measures to repair the physical impact, change, alteration, damage, and loss from COVID-19 and SARS-CoV-2. The Hotel Properties have had to, among other things, reduce capacity, close or suspend certain operations and services, substantially modify others, and introduce protocols to continue their business operations as nearly normal as practicable despite ongoing physical loss and damage to portions of their property, and attempt to repair and restore the facilities to their pre-COVID-19 and pre-SARS-CoV-2 physical operating condition (a process which is ongoing).

**C.  HIT's Physical Loss and Damage Trigger Multiple Coverages Under the Program.**

**1.  Time Element Coverage Applies to HIT's Claim.**

82. Time Element coverage is triggered by losses "directly resulting from physical loss or damage of the type insured by this Policy . . . located at an Insured Location or within 1,000 feet of it" when HIT is wholly or partially prevented from continuing operations or services.

83. As alleged above, the physical alteration and change to the content of the indoor air and the composition of the surfaces throughout the buildings and structures at the Hotel Properties as a result of individuals infected with COVID-19 shedding SARS-CoV-2 particles is direct physical damage of insured property (including indoor air and surfaces).

84. As alleged above, the unplanned intrusion of COVID-19 and SARS-CoV-2 onto the property causing it to be unfit for and unable to be used for its full insured use is direct physical loss of the insured property.

85. This direct physical loss of and damage to insured property has prevented the partial or whole continuation of HIT's business operations at the Hotel Properties.

86. This direct physical loss and damage of insured property was caused by the introduction of COVID-19 and SARS-CoV-2, perils insured by the "all risk" policies, and not within any coverage exclusions.

87. Because the Hotel Properties sustained direct physical loss and damage of insured property caused from COVID-19 and SARS-CoV-2, perils insured, and because the direct physical loss and damage of insured property from these perils prevented HIT's business or service operations, the Time Element coverage has been triggered.

88. HIT already identified to the Insurers at least 59 guests and staff members with positive COVID-19 diagnoses that caused business interruption losses (this is a conversative number because, *inter alia*, it is based on reported cases following a positive diagnosis, which does not reflect the higher number of individuals that were infected and at the sites given the overall community prevalence of COVID-19).

89. These business interruptions losses are because of the facts as alleged in the preceding paragraphs (and elsewhere here).

**D. Communicable Disease Coverage Applies to HIT's Claim.**

90. The Communicable Disease Coverage is separate and apart from the other coverages that require "physical loss or damage." This coverage provides for recovery for resulting business interruption losses and communicable disease extra expense, even with no direct physical loss or damage.

91. As explained here and in HIT's correspondence to the Insurers, HIT has shown that COVID-19 and SARS-CoV-2 (a communicable disease) was on-site at the Hotel Properties. Further, access to such Hotel Properties was limited, restricted or prohibited by an order of an

21

Case 1:22-cv-08781  Document 1-1  Filed 10/14/22  Page 23 of 38

authorized governmental agency or by a decision of a HIT officer as a result of the actual not suspected presence of communicable disease.  In this regard, the requisite governmental authority orders do not need to be directed to HIT specifically.

92.     As part of its correspondences, HIT provided the Insurers, in relevant part, with: (i) the specific site information (site numbers and addresses) for 42 HIT locations damaged and affected by COVID-19; (ii) orders impacting such sites; (iii) a breakdown per site of the business interruption losses sustained because of COVID-19 loss and damage; and (iv) a breakdown per site, by date, of the number of COVID-19 positive diagnoses.

93.     Given the above, the Program's Communicable Disease Coverage up to $4,000,000 has been triggered for, *inter alia*: (i) the Actual Loss Sustained and EXTRA EXPENSE incurred by HIT; and (ii) cleanup, removal and disposal of the actual not suspected presence of a communicable disease.

### 1.     Other Relevant Coverages Apply to HIT's Claim.

94.     Civil or Military Authority coverage is an alternative coverage that is triggered when, as a result of direct physical loss or damage due to a covered peril at a location other than a Hotel Property (and within a five-mile radius), civil or military authorities issue orders that prevent access to the Hotel Properties, impacting normal business operations at the Hotel Properties.  The requisite civil or military orders need not be directed to HIT specifically.  Because the Hotel Properties sustained necessary interruption to their business directly resulting from civil authority orders prohibiting or limiting access to the Hotel Properties because of direct physical loss or damage at any location within five miles of the Hotel Properties, the Program's Civil or Military Authority coverage has been triggered.

95.     Cancellation of Bookings coverage provides coverage for the "cessation or diminution of trade due to a loss of potential customers at an Insured Location" if there is direct

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 24 of 38

physical loss or damage to: (i) covered property by a covered cause of loss; or (ii) property of the type insured under this policy by a covered cause of loss which directly affects the Insured's use of the covered property. Because the Hotel Properties sustained direct physical loss or damage caused by COVID-19 and SARS-CoV-2, the Program's Cancellation of Bookings coverage has been triggered.

96. Extra Expense coverage is triggered by the same direct physical loss and damage at the Hotel Properties as Time Element coverage. Because the Time Element coverage is triggered as discussed above, the Program's Extra Expense coverage is also triggered, and permits HIT to recover "the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY . . . to temporarily continue as nearly normal as practicable the conduct of the Insured's business . . . ."

97. Ingress/Egress coverage is triggered by the prevention of ingress to and egress from the Hotel Properties caused by direct physical loss and damage caused by COVID-19 and SARS-CoV-2 at the Hotel Properties. Because direct physical loss and damage caused by COVID-19 and SARS-CoV-2 prevented ingress to and egress from the Hotel Properties, the Program's Ingress/Egress coverage has been triggered.

98. Attraction Property coverage is triggered by the direct physical loss and damage caused by COVID-19 and SARS-CoV-2 (just as it causes physical loss or damage at the Hotel Properties) at properties that directly attract business to the Hotel Properties. Because properties that directly attract business to the Hotel Properties sustained direct physical loss or damage caused by COVID-19 and SARS-CoV-2, the Program's Attraction Property coverage has been triggered.

99. Contingent Time Element coverage, which differs from the Time Element coverage for Gross Earnings and Extra Expense, is triggered by the direct physical loss or damage caused

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 25 of 38

by COVID-19 and SARS-CoV-2 (just as it causes physical loss and damage at the Hotel Properties) at properties of suppliers and customers of the Hotel Properties. Because properties of suppliers and customers of the Hotel Properties sustained direct physical loss or damage caused by COVID-19 and SARS-CoV-2, the Program's Contingent Time Element coverage has been triggered.

**E. The Program's Exclusions Do Not Foreclose Coverage.**

100. The Program's insurers also claim that HIT's losses are excluded under the certain exclusions, but none of the Program's exclusions apply to the Claim.

101. Among the exclusions that are inapplicable to HIT's Claim are those related to "pollution" and/or "contamination." The Program cannot simultaneously provide coverage for Communicable Disease (including, but not limited to, the communicable disease COVID-19), yet purport simultaneously to exclude coverage for its causative agent (SARS-CoV-2) under environmental pollution or contamination-related exclusions in the policies on the theory that SARS-CoV-2 is an excluded contaminant or pollutant under the policies.

102. The Program's Communicable Disease Response coverage specifically includes coverage for the "cleanup, removal and disposal" of communicable disease. This necessarily means that the Program covers the causative virus or disease causing agent, as that is the only tangible substance that can be cleaned, removed or disposed of.

103. The Program's "pollution" and/or "contamination" exclusions cannot, therefore, apply to the virus or disease causing agent that causes a Communicable Disease, as that term is specifically defined in the Program (*i.e.*, disease and virus that is "transmissible from human to human.") These exclusions, however, may still apply to viruses and disease causing agents that do not meet the Program's definition of "Communicable Disease" or its causative agents.

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 26 of 38

104.     Further, nowhere do the Communicable Disease Coverage provisions provide that they are exceptions or exemptions from the pollution or contamination-related exclusions (or any alternatives).  Nor does the pollution or contamination-related exclusions (or any alternative) provide that the Communicable Disease Coverage provisions are an exception or exemption from the exclusion(s).  The words of the policies must be read in a manner that gives meaning to all language and leaves no provision without force and effect.  This is particularly the case here, where the words chosen for the pollution or contamination-related exclusions (and any alternatives) must be read strictly and narrowly, while the words chosen for the grant of Communicable Disease Coverage must be read broadly and in favor of HIT.  Nor can the words be read in a way that renders coverage illusory or that makes no sense.  Thus, consistent with these rules of construction and interpretation, the pollution and contamination-related exclusions cannot be read to void the coverage afforded under the Communicable Disease Coverage or render some coverage provisions mere surplusage.

105.     There are exclusions in common usage in the insurance industry that the Insurers could have included in the Program to unambiguously exclude losses caused by communicable diseases, viruses, and pandemics.  The insurance industry has known the risks associated with pandemics for decades.  These risks have been even more pronounced and evident to the Insurers in recent decades because of the first SARS, Ebola, MERS, H1N1, and Zika.

## VI.     THE INSURERS' BAD FAITH.

### A.     The Insurers' Failure to Investigate.

106.     When HIT submitted its claim for COVID-19 losses at and around the Hotel Properties in March 2020, the Insurers already intended to deny coverage.  The Insurers then engaged in conduct that was intended to hide their predetermination and give the impression that

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 27 of 38

they were actively investigating and considering the Claim, which wasted extraordinary amounts of HIT's time and money.

107.    In response to HIT's March 2020 notice of claim, the Insurers' designated adjuster, Sedgwick, did not undertake any analysis of the policies or the facts of the Claim. Instead, Sedgwick sent HIT a list of questions by letter, several of which were impossible to answer, conflicted with the plain language of the policies, did not apply to the operations at the Hotel Properties, and were solely designed to lead to one result: denial of the Claim.

108.    For example, Sedgwick's questionnaire asked HIT whether "the insured property [had] been tested for the presence of COVID-19." In May 2020, when this request was made, Sedgwick and the Insurers knew, or should have known, that there were no test kits for surfaces (or air for that matter) readily available to the public and that the only way to test for "contagious" viral particles would have been to use the services of a BSL-3 lab, which was not feasible for private testing of this nature. Furthermore, Sedgwick and the Insurers knew that PCR testing of individuals was done on an extremely limited basis (generally only in the healthcare setting) and antigen testing was not yet commercially available.

109.    By letter dated August 31, 2020, HIT confirmed for the Insurers the harmful presence of COVID-19 and SARS-CoV-2 on-site at the Hotel Properties caused and was causing physical loss and damage. It advised that, as of August 18, 2020, at least 25 employees, 6 guests, and 6 third-party contractors had tested positive for COVID-19, thus making the presence of COVID-19 evident.

110.    Months later, in a letter dated November 20, 2020, Sedgwick and the Insurers advised they had considered HIT's submission, but still found it incomplete. Yet, even with the "incomplete" information, they said that HIT had not proven a covered loss.

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 28 of 38

111.    The Insurers argued that "any alleged presence of the COVID-19 virus at any property, including but not limited to an insured location or to property other than property at the described premises, does not constitute insured physical loss or damage." Even so, the Insurers still asked more questions about HIT's loss, including asking HIT to "identify with specificity what property you contend sustained physical loss or damage, and identify the physical loss or damage that each such property sustained." In other words, the Insurers asked HIT to prove it experienced physical loss or damage while also claiming it could not have experienced physical loss or damage. The Insurers put HIT in an impossible position when HIT could least afford it.

112.    Nonetheless, HIT responded on December 21, 2020, identifying with specificity the property it contended sustained physical loss and damage, and identifying the physical loss and damage that each property sustained. HIT calculated the likely number of guests and employees with COVID-19 on-site, explained how COVID-19 affected its properties (*e.g.*, the "impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property"), and outlined its repair efforts.

113.    The Insurers continued to "welcome" information from HIT. And so, on March 17, 2021, HIT identified individuals diagnosed with COVID-19 at the Hotel Properties.

114.    On June 3, 2021, the Insurers advised HIT that it still had not provided enough information, but did not explain what other information they required. Instead, they threatened to close the claim if HIT did not respond within 30 days. This communication had taken the Insurers almost 80 days to prepare, yet, inexplicably, they insisted that HIT respond with more expedience than their own standard.

Case 1:22-cv-08781   Document 1-1   Filed 10/14/22   Page 29 of 38

115.    HIT requested more time to respond, and eventually provided a complete Claim presentation on August 20, 2021.   HIT provided a comprehensive, detailed chart that demonstrated:

a.   A minimum of 42 Hotel Properties had individuals with COVID-19 positive test diagnoses during 2020 (this is a conversative number because, *inter alia*, it is based on reported cases and positive diagnosis, which is not an accurate marker of the much higher total number of people infected at the locations given the high prevalence of COVID-19);

b.   The COVID-19 positive test diagnoses at these Hotel Properties totaled a minimum of 59;

c.   The business interruption losses at these Hotel Properties, at minimum, $53,980,000; and

d.   Federal, state, and local health authorities issued hundreds of orders applicable to the Hotel Properties impacting the operations and access to the hotels.

116.    The August 20, 2021 letter also detailed the costly actions taken by HIT to repair and restore its property.   These actions included, for example, reconfiguring worker and guest common spaces, frequent cleaning, and disinfection, and enhanced room sanitization.

117.    On October 10, 2021, Endurance and Interstate denied coverage.

118.    Three months after receiving HIT's additional information, Zurich and AWAC issued a partial denial of coverage.  In their December 1, 2021 letter, these Insurers claimed to still need additional information.  Without acknowledging coverage, they then sent more onerous and unnecessary requests on February 8, 2022 on behalf of a third-party forensic accountant.

119.    On February 14, 2022, Starr denied coverage.

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 30 of 38

120. On March 1, 2022, Arch and Westport denied coverage.

121. On March 22, 2022, HIT responded to Zurich and AWAC's request for additional information.

122. The Insurers meant to give the impression that they were investigating the Claim, evaluating coverage in good faith, and would be willing to reconsider the Claim if HIT submitted additional information. But in reality, the Insurers merely intended to create burdensome work for HIT, to discourage HIT from pursuing the Claim, and to paint an inaccurate picture that HIT was somehow delaying the Insurers' investigation or not cooperating.

123. At no time did any Insurers or Sedgwick visit the Hotel Properties (or even request to do so). They did not test a single Hotel Property for the presence of COVID-19 and SARS-CoV-2. Nor did the Insurers or Sedgwick engage any expert or consultant to make a physical inspection of the Hotel Properties to determine whether COVID-19 or SARS-CoV-2 was present.

124. For nearly two years, then, the Insurers have pursued extraneous and never-ending information requests designed to mask their pretense of a claim investigation and pre-ordained coverage denial. By continuing to demand additional information at the same time as they reject or find insufficient the significant information that HIT has submitted to date, and by willfully refusing to accept and acknowledge the presence of COVID-19 at the Hotel Properties, the Insurers seek to hide the fact that they always intended to deny coverage regardless of HIT's responses to their information requests.

125. As a result of the Insurers' single-minded focus on denying the Claim—no matter what information HIT provides in support, among other things—the Insurers have failed to reach a prompt, fair, and equitable settlement of the Claim, have engaged in conduct designed to deprive

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 31 of 38

HIT of its full insurance benefits, and have forced HIT to pursue this litigation to recover the insurance owed.

## COUNT I
### (Declaratory Relief)

126.     HIT repeats and realleges the allegations in the preceding paragraphs.

127.     The insurance policies described above are valid and enforceable insurance contracts.  The specific duties and obligations of the Insurers are set forth in the policies identified above.  Each of the policies is a valid and enforceable insurance contract.

128.     HIT performed all the obligations and conditions precedent to coverage under the policies.  Any conditions or requirements of the policies, including the payment of all premiums, have been satisfied, waived, excused, or are otherwise inapplicable.

129.     The policies provides maximum coverage for, among other things, physical loss or damage to the Hotel Properties, HIT's business interruption losses, and extra expenses that HIT incurred as a result of the physical loss and damage to HIT's property.  The Program also provides coverage for communicable disease without the requirement that there be physical loss or damage.

130.     HIT submitted a claim for loss as a direct result of a covered cause of loss.  HIT was denied coverage, or the Insurers effectively repudiated their obligations to provide coverage, under the policies based on the Insurers' improper position that, among other things, HIT has not suffered any direct physical loss or damage to its insured properties (i.e., the Hotel Properties) as a result of the actual presence of COVID-19 and that any claim for loss or damage due to COVID-19 / SARS-CoV-2 is excluded under the policies.

131.     An actual, justiciable controversy exists between HIT and the Insurers concerning the availability and amount of coverage under the policies for the Claim.

132.     The controversy between the Insurers and HIT is ripe for judicial review.

Case 1:22-cv-08781   Document 1-1   Filed 10/14/22   Page 32 of 38

133.    As a result, HIT seeks a declaration from the Court that: (i) the Claim triggers the various coverage provisions identified above; (ii) the Program covers the Claim; (iii) HIT sustained direct physical loss or damage to insured interests in real or personal property from a covered cause of loss under the policies; (iv) no exclusion applies to bar or limit coverage for the Claim; and (v) granting any other declaratory relief useful to resolving the dispute between the parties.

## COUNT II
### (Breach of Contract)

134.    HIT repeats and realleges the allegations in the preceding paragraphs.

135.    The polices described above are a valid and enforceable insurance contract.  The specific duties and obligations of the Insurers that subscribed to the policies are set forth in the insurance policies identified above.  Each of the insurance policies is a valid and enforceable insurance contract.

136.    HIT performed all the obligations and conditions precedent to coverage under the policies, and under each of the insurance policies.  Any conditions or requirements of the policies and of each insurance policy have been satisfied, waived, excused, or are otherwise inapplicable.

137.    The Insurers breached the policies by improperly denying coverage for the Claim, including but not limited to coverage for communicable disease, or by otherwise repudiating their respective and collective obligations to cover HIT's losses and expenses as expressly required under the policies.

138.    HIT has sustained and continues to sustain damages as a result of the Insurers' breach of the policies.

139.    HIT is entitled to damages as a result of the Insurers' breaches in an amount to be determined at trial, including compensatory and consequential damages, pre-judgment and post-

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 33 of 38

judgment interest, attorneys' fees, and costs, and any other costs and relief that this Court deems appropriate.

<u>**COUNT III**</u>
**(Breach of the Covenant of Good Faith and Fair Dealing)**

140. HIT repeats and realleges the allegations in the preceding paragraphs.

141. The Insurers are required to act in good faith, abstain from deception, and practice honesty and equity in all dealings with their policyholders, including HIT, under the insurance policies they sells.

142. The business of insurance affects the public interest.

143. The Insurers owe a covenant of good faith and fair dealing to HIT given the insurance and contractual relationship created by the policies.

144. The covenant of good faith and fair dealing obligates each party to the contract to refrain from taking any action that would deprive the other of the benefits of the contract or to cause undue hardship or harm to the other party.

145. The Insurers' conduct described in this Complaint and otherwise in investigating, handling, and denying HIT's Claim under the policies constitutes bad faith.

146. The Insurers acted in bad faith with respect to HIT by and through the Insurers' unreasonable, malicious, reckless, grossly negligent or intentional failure to adequately adjust and investigate HIT's Claim and refusal to pay HIT the benefits to which HIT is entitled under the policies.

147. The Insurers' reaction to HIT's claims was to press HIT to respond to overly burdensome, premature or unnecessary information requests to create time-consuming and costly work, to dissuade HIT from pursuing its Claim, and to paint an inaccurate picture that HIT was

Case 1:22-cv-08781   Document 1-1   Filed 10/14/22   Page 34 of 38

somehow delaying the investigation or not cooperating and that the Insurers were investigating the Claim and evaluating coverage in good faith.

148.    The unreasonable nature of those tactics is also demonstrated by the fact that, because the Insurers deny that the presence of COVID-19 amounts to physical loss or damage, the Insurers always intended to deny coverage regardless of HIT's responses to those inquiries.

149.    In violation of the duties to HIT and because of the Insurers' gross negligence, the Insurers acted in bad faith by, among other acts and omissions:

    a.  unreasonably, maliciously, recklessly, or intentionally denying the obligations to pay benefits or by repudiating the obligations to pay benefits to HIT when they knew, or should have known, they had an obligation to provide insurance coverage;

    b.  failing and refusing to pay covered loss under the policies without a reasonable or arguable basis to do so and with the knowledge or reckless disregard of their lack of reasonable or arguable basis to refuse coverage;

    c.  unreasonably, maliciously, reckless, or intentionally delaying payment of insurance proceeds due and owed to HIT under the policies,

    d.  failing to conduct a fair, complete and proper investigation of HIT's Claim before denying coverage or repudiating their obligation to provide coverage; and

    e.  breaching their promise of security to HIT by unreasonably and without justification reneging on the all-risk commercial property insurance benefits they promised to provide HIT, leaving HIT without the benefits of its insurance assets to operate its business during a pandemic.

33

150. The bad faith acts and omissions by Insurers described above is the type of egregious disregard for the obligations specified by the broad, all risk policies and the rights entitled to HIT under insurance policies that would result in foreseeable losses and damages to the policyholder as to require imposing consequential damages.

151. Upon information and belief, the Insurers' bad faith conduct described above was perpetrated to place their own pecuniary interests ahead of HIT's and for withholding from HIT the rights and benefits to which HIT is entitled under the policies.

152. As a result of the Insurers' bad faith breach of their obligations under the policies, HIT has suffered and will continue to suffer substantial damages in an amount to be proven at trial, including additional loss of business income, extra expense, and attorneys' fees that HIT would not otherwise have needed to pay had the Insurers made full payment of HIT's losses covered under the policies.

153. Those damages were a natural and probable consequence of the Insurers' breach, were or should have been foreseeable to the Insurers, and were reasonably contemplated by the parties because, for example, the widespread financial, operational, and liquidity risks associated with pandemics have been known to the insurance industry for decades and were explicitly recognized by Insurers as risks that could impact the frequency, severity, and development of insured claim events.

154. Because the Insurers recognized for years that pandemics may impact their own operations, financial conditions, solvency, and capital and liquidity positions or prospects, it was or should have been reasonably foreseeable when they sold the policies that the refusal to afford protection under the broad, "all risk" Program sold to HIT for those same risks would have immediate and dire financial consequences to HIT, including, but not limited to, attorneys' fees,

Case 1:22-cv-08781 Document 1-1 Filed 10/14/22 Page 36 of 38

expenses, and other consequential damages, all directly resulting from the Insurers placing their own pecuniary interests ahead of the policyholder's and forcing HIT into litigation to recover the benefits under the policies.

155.    HIT is entitled to damages as a result of the Insurers' breach of the covenant of good faith and fair dealing, including compensatory and consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and any other costs and relief that this Court deems appropriate.

**COUNT IV**
**(Violation of N.Y. Gen. Bus. Law § 349)**

156.    HIT repeats and realleges the allegations in the preceding paragraphs.

157.    HIT, like the thousands of other businesses who enter into insurance contracts with Insurers, is an individual consumer of insurance products.

158.    The policies have "all risks" coverage language designed and intended to be bought by the public at large in the State of New York and elsewhere.

159.    Insurers routinely utilize the same or similar policy language to the one at issue here in issuing other policies. As such, HIT's acts and practices could affect similarly-situated consumers suffering losses arising from COVID-19 that have bought policies from Insurers with materially identical wording.

160.    Insurers acts and practices in investigating, handling, and denying HIT's Claim and other policyholders' claims based on the same or similar policy language has a broad effect on insurance consumers at large.

161.    In fact, other policyholders have filed lawsuits against Insurers in New York (and elsewhere) raising coverage disputes involving COVID-19-related losses under similar policies to the ones at issue in this action. Those other insurance coverage lawsuits allege, among other

35

Case 1:22-cv-08781  Document 1-1  Filed 10/14/22  Page 37 of 38

things, that the Insurers knew the "all risk" policies provided coverage for COVID-19-related losses, yet the Insurers still denied claims with no genuine investigation, taking the same improper, blanket approach to denying claims as what occurred with HIT's Claim.

162.    Thus, the dispute here is not limited to a challenge over coverage made on the facts unique to HIT, but rather relates to consumer-oriented conduct affecting the public.

163.    Insurers consumer-oriented practices were materially misleading and deceptive, including when Insurers failed to pay benefits due to HIT under the policies.

164.    Besides failing to pay benefits due under the policies, through the misleading and deceptive acts discussed the Insurers engaged in a scheme to discourage or obstruct HIT from recovering under the policies.

165.    As a result of the Insurers' consumer-oriented, materially misleading and deceptive acts or practices, HIT has suffered and will continue to suffer substantial damages in an amount to be proven at trial.

166.    HIT is entitled to damages as a result of the Insurers' deceptive acts and practices, including compensatory and consequential damages, treble damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and any other costs and relief that this Court deems appropriate.

* * *

HIT respectfully request that the Court:
Declare that:

1.    HIT's Claim triggers the various coverage provisions identified in this Complaint;

    a.    the policies cover HIT's Claim;

    b.    HIT sustained direct physical loss or damage from a covered cause of loss under the policies;

36

Case 1:22-cv-08781  Document 1-1  Filed 10/14/22  Page 38 of 38

    c.   no exclusion applies to bar or limit coverage for HIT's Claim; and

    d.   granting any other declaratory relief useful to resolving the dispute between the parties;

2.    Order the Insurers to provide coverage for HIT's Claim under the policies;

3.    Award damages, including actual, compensatory, consequential, special, exemplary, and punitive damages, against the Insurers in an amount to be determined at trial;

4.    Award pre-judgment, post-judgment, and statutory interest;

5.    Award attorneys' fees and costs of suit incurred; and

6.    Grant such other relief, including any equitable relief, as the Court deems just and proper.

Dated: June 21, 2022            HUNTON ANDREWS KURTH LLP

                             */s/ Michael S. Levine*
                             Michael S. Levine
                             200 Park Avenue
                             New York, NY 10166
                             mlevine@huntonak.com
                             212-309-1170

                             *Attorneys for Plaintiff,*
                             *Hospitality Investors Trust, Inc.*

37